# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

AMY REDD, as Personal Representative of the
Estate of Susan L. Creswell, MAC A. FLEMING,
GAIL A. MEISEL, JOHN M. PESTA, and
ERNEST L. TORSKE,

      Plaintiffs,                                    Case No. 08-11457

v.                                                         Hon. Gerald E. Rosen

BROTHERHOOD OF THE MAINTENANCE OF WAY
EMPOYES DIVISION OF THE INTERNATIONAL
BROTHERHOOD OF TEAMSTERS, and
BROTHERHOOD OF THE MAINTENANCE OF WAY
EMPLOYES DIVISION PENSION PLAN,

      Defendants.
_____/

## OPINION AND ORDER REGARDING
## CROSS-MOTIONS FOR SUMMARY JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on _____ March 31, 2010 _____

PRESENT:  Honorable Gerald E. Rosen
                  Chief Judge, United States District Court

## I.  INTRODUCTION

Plaintiffs Mac A. Fleming, Gail A. Meisel, John M. Pesta, and Ernest L. Torske

are retired former employees of the Defendant Brotherhood of the Maintenance of Way

(the "Brotherhood") who receive pension benefits under the Defendant Brotherhood of

the Maintenance of Way Employes Division Pension Plan (the "Plan").[1]  In June of 2007 — after each of the Plaintiffs had retired and was drawing pension benefits from the Defendant Plan — the Defendant Brotherhood, as plan administrator, adopted a new interpretation of certain Plan terms and applied this new construction retroactively to recalculate Plaintiffs' pension benefits, resulting in reduced monthly payments to Plaintiffs going forward.  What is more, the Defendant Brotherhood began to withhold additional amounts from Plaintiffs' monthly benefit payments, in order to recoup alleged overpayments made to Plaintiffs prior to June of 2007.  In response, Plaintiffs brought the present suit in April of 2008, asserting two claims arising under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*:  (i) a claim under § 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), to recover benefits allegedly owed under the terms of the Plan, and (ii) a claim that the Defendant Brotherhood allegedly breached various fiduciary duties owed to the Plaintiff plan participants under § 404(a)(1) of ERISA, 29 U.S.C. § 1104(a)(1).[2]

Presently pending before the Court are cross-motions filed by Plaintiffs and Defendants, in which each side seeks an award of summary judgment in its favor on Counts I and II of the complaint.  In support of their motion, Plaintiffs argue (i) that the

[1]A fifth Plaintiff, Susan L. Creswell, was named in the initial complaint, but her claims have been resolved.  Ms. Creswell passed away after the commencement of this suit, and her claims were then pursued on behalf of her estate by personal representative Amy Redd.

[2]The complaint also includes two other counts, but Plaintiffs have voluntarily withdrawn these claims.

plan administrator's recent reinterpretation of Plan terms is arbitrary and capricious, particularly in light of the construction the plan administrator previously gave to these terms when initially calculating Plaintiffs' pension benefits; and (ii) that the Defendant Brotherhood, as plan administrator, breached a fiduciary duty owed to Plaintiffs by reducing Plaintiffs' accrued pension benefits in violation of ERISA's "anti-cutback" provision, 29 U.S.C. § 1054(g).  For their part, Defendants argue that the plan administrator's reinterpretation of Plan terms was reasonable and faithful to the language of the Plan, and that the Brotherhood acted in accordance with ERISA and the terms of the Plan in applying this reinterpretation to recalculate Plaintiffs' pension benefits and seek recoupment of past overpayments.

These cross-motions have been fully briefed by the parties.  Having reviewed the parties' motions, briefs, and accompanying exhibits, as well as the administrative record submitted separately by the parties, the Court finds that the relevant allegations, facts, and legal arguments are adequately presented in these written submissions, and that oral argument would not aid the decisional process.  Accordingly, the Court will decide the parties' cross-motions "on the briefs."  *See* Local Rule 7.1(e)(2), U.S. District Court, Eastern District of Michigan.  This opinion and order sets forth the Court's rulings on these motions.

## II.  **FACTUAL BACKGROUND**

Plaintiffs Mac Fleming, Gail Meisel, John Pesta and Ernest Torske are all retired former employees of the Defendant Brotherhood,[3] with retirement dates spanning from November of 2001 to October of 2006.  Since their retirement, Plaintiffs have received pension benefits under the Defendant Plan.  The Defendant Brotherhood is the plan administrator of the Plan.

### A.      **The Relevant Terms of the Plan**

The claims in this case arise from the Defendant Brotherhood's decision in June of 2007 to reinterpret certain terms of the Plan, resulting in the reduction of Plaintiffs' monthly pension benefits and the withholding of additional amounts from these payments in order to recoup alleged overpayments made in reliance on the prior, purportedly mistaken construction of the Plan.  Accordingly, the Court turns first to the Plan provisions that bear upon the calculation of Plaintiffs' pension benefits.

The Plan defines a number of terms that factor into the computation of pension benefits.  First, it defines an "Accrued Benefit" as "the amount determined in accordance with Section 5.1" of the Plan.  (Defendants' Motion, Ex. A, Plan at § 1.1.)  Next, "Compensation" is defined as "the Employee's basic earnings, paid by the Employer for a Plan Year which is exclusive of overtime, bonuses, and other extraordinary compensation."  (*Id.* at § 1.9.)  The Plan further defines "Final Average Monthly

---

[3]As noted earlier, the claims of a fifth Plaintiff, Susan Creswell, have been resolved.

Compensation" as "the average monthly rate of pay determined by dividing by thirty-six (36) the sum of the Employee's Compensation during the thirty-six (36) highest paid consecutive calendar months during the ten (10) year period preceding his termination." (*Id.* at § 1.15.)  Finally, a "Plan Year" is defined as "[t]he twelve (12) month period commencing on January 1 of each year and ending the following December 31." (*Id.* at § 1.29.)

As noted, the Plan's definition of an "Accrued Benefit" references § 5.1 of the Plan, and this section, in turn, states that an "Accrued Benefit means the Normal Retirement Pension payable at Normal Retirement Date determined pursuant to Section 6.2." (*Id.* at § 5.1.)  This latter section provides that "the monthly amount of the Normal Retirement Pension shall be equal to . . . [o]ne-twelfth (1/12th) of one and one-half percent (1-1/2%) of Final Average Monthly Compensation times Months of Benefit Service (computed to the nearest penny)." (*Id.* at § 6.2.)

One of the four Plaintiffs, Gail Meisel, elected early retirement, and the calculation of early retirement benefits is governed by Section 7 of the Plan.  First, this portion of the Plan provides that "[t]he monthly amount of the Early Retirement Pension shall be equal to the Accrued Benefit" that applies to normal retirees. (*Id.* at § 7.2.)  Next, following a July 1, 2002 amendment to the Plan's early retirement provisions, the Plan provides:

> Payment of Benefits.  Payment of an Early Retirement Pension shall commence as of the Participant's Normal Retirement Date.  However, if a Participant who qualifies for Early Retirement terminates his employment with the Employer after July 1, 2002 and requests the Committee to authorize the commencement of his Early Retirement Pension as of the first

day of the month coincident with or next following his early retirement, or as of the first day of any subsequent month which precedes his Normal Retirement Date, his pension shall commence as of the beginning of the month so requested ("Requested Early Retirement Date"), but the amount thereof shall be reduced to provide the greater of: (a) his Accrued Benefit actuarially reduced using the actuarial assumptions specified in Appendix A; or (b) reduced by three per cent (3%) for each complete Plan Year between the Participant's Normal Retirement Date and his Requested Early Retirement Date.

(Defendants' Motion, Ex. B, 7/1/2002 Early Retirement Amendments at 1-2 (amending § 7.3 of the Plan).)

Finally, the Plan includes some more general provisions that are relevant to the claims in this case. First, the Plan prohibits the Defendant Brotherhood from "amend[ing] this Plan [to] reduc[e] any Participant's Accrued Benefit," unless such an amendment is permitted under a separate provision triggered by the Brotherhood's "substantial financial hardship." (Defendants' Motion, Ex. A, Plan at §§ 5.2(a), 9.5.) Similarly, another Plan provision states that "[n]o amendment to the Plan (including a change in the actuarial basis for determining optional or early retirement benefits) shall be effective to the extent that it has the effect of decreasing a Participant's Accrued Benefit." (*Id.* at § 13.1.)

## B. The Initial Calculation of Plaintiffs' Pension Benefits Under the Plan

As noted, the four remaining Plaintiffs in this case retired between November of 2001 and October of 2006. In each case, their pension benefits were calculated under the above-quoted terms of the Plan. The principal point of dispute in this case is whether the so-called "final vacation pay" received by these four individuals upon their retirement should be considered part of their "compensation" within the meaning of the Plan, such

6

that their pension benefits should be calculated based on an increased level of "compensation" that includes this lump-sum payment for vacation time that these individuals had accrued but not used at the time of their retirement.

As explained in the affidavit of Plaintiff Gail Meisel, employees of the Defendant Brotherhood earn paid vacation in one year that they may then use during the following year. (*See* Plaintiffs' Motion, Ex. 10, Meisel Aff. at ¶ 8.)[4] Upon retirement, then, an employee may have two categories of earned but unused vacation: (i) vacation earned the previous year but not used prior to the employee's retirement date, and (ii) vacation earned in the current year that would have been available for use the following year, but for the employee's retirement. (*See id.* at ¶ 8.) Meisel states without contradiction in her affidavit that "[t]he Brotherhood's longstanding practice has been to pay the retiring employee for all of [his or her] unused earned vacation in the employee's final paycheck." (*Id.* at ¶ 8.) The question becomes, then, whether this lump-sum amount of "final vacation pay" in an employee's final paycheck should be deemed part of his or her "compensation" within the meaning of the Plan, such that the calculation of the employee's pension benefits should incorporate this additional amount — resulting, of course, in increased pension benefits.

When each of the four Plaintiffs retired and his or her pension benefits were

---

[4]The Brotherhood has adopted a "use it or lose it" scheme of vacation accrual, under which vacation time may no longer be used after the year in which it becomes available for use. (*See id.* at ¶ 7.) For example, if an employee worked in 2005 to earn paid vacation time in 2006, he or she had to use this paid vacation time by the end of 2006, and any unused vacation days were not carried over to 2007.

initially computed, the answer to this question was "yes" — that is, the determination of Plaintiffs' "compensation" under the Plan (and, in turn, the calculation of their pension benefits) included the final vacation pay reflected in their final paychecks. The Brotherhood's secretary-treasurer until 2003, Bill LaRue,[5] explained that an employee's final vacation pay was considered "earned" income, such that it was viewed by those with plan administration responsibilities as regular rather than "extraordinary" compensation under the Plan's definition of "compensation." (*See* Plaintiffs' Motion, Ex. 9, LaRue Dep. at 14, 16-17.) LaRue further testified that he consulted with the Plan's attorney, Kalman Goren, in determining that the term "compensation" as used in the Plan should be construed as encompassing an employee's final vacation pay. (*See id.* at 14-17.) In addition, Plaintiffs point out that the Plan calls for a three-percent "[p]articipant[] [c]ontribution[]" to be withheld from each employee's "monthly compensation," (*see* Defendant's Motion, Ex. A, Plan at § 12.2(a)), and Defendants concede that in the case of each Plaintiff, this three-percent Plan contribution was withheld from the entirety of his or her final paycheck, including the portion attributable to final vacation pay. (*See* Plaintiffs' Motion, Ex. 8, Geller Dep. at 40-41.)

This interpretation of the Plan was applied to compute the pension benefits of each of the four Plaintiffs. Indeed, even after the retirement of Bill LaRue as the

---

[5]Under the express terms of the Plan, both the president and the secretary-treasurer of the Brotherhood were deemed to be "plan administrators." (*See* Defendant's Motion, Ex. A, Plan at § 1.27.) Thus, LaRue was a plan administrator during the period he served as the Brotherhood's secretary-treasurer.

Brotherhood's secretary-treasurer and Plaintiff Mac Fleming as the Brotherhood's president, the current president, Freddie Simpson, and secretary-treasurer, Perry Geller, approved the calculation of Plaintiff Fleming's and Plaintiff Meisel's pension benefits using this interpretation of the Plan.[6]  In addition, each of the Plaintiffs was credited with an additional "month of service" in light of his or her unused vacation, (*see* Plaintiffs' Motion, Ex. 10, Meisel Aff. at ¶ 8), which in turn resulted in increased pension benefits.

Apart from this question of what constitutes "compensation" under the Plan, another issue of Plan interpretation factored into the calculation of Plaintiff Gail Meisel's pension benefits.  Meisel retired in October of 2006, ten months before her normal retirement date, and her pension benefits therefore were computed by resort to the Plan's early retirement provisions.  In particular, under § 7.3 of the Plan as amended effective July 1, 2002, if an early retiree elects to receive his or her pension benefits immediately upon retirement, rather than deferring the payment of benefits until the employee's normal retirement date, the benefits are to be "reduced by three per cent (3%) for ***each complete Plan Year*** between the Participant's Normal Retirement Date and his Requested Early Retirement Date."  (Defendants' Motion, Ex. B, 7/1/2002 Early Retirement Amendments at 1-2 (emphasis added).)  In the initial calculation of Meisel's pension benefits, it was determined that her benefits were not subject to reduction under § 7.3 of the Plan, because there was no "complete Plan Year" between her early retirement date in

---

[6]As noted earlier, Simpson and Geller became plan administrators upon assuming the offices of president and secretary-treasurer of the Brotherhood.

October of 2006 and her normal retirement date ten months later (*i.e.,* in mid-2007).

Rather, because the Plan defines a "Plan Year" as an ordinary calendar year from January

1 to December 31, (*see* Defendants' Motion, Ex. A, Plan at § 1.29), it was determined that

no "complete" calendar year elapsed between Meisel's early and normal retirement

dates.[7]

## C.     The Recalculation and Reduction of Plaintiffs' Pension Benefits

From their retirement dates until mid-2007, Plaintiffs received monthly pension

benefits in accordance with the initial calculations of their benefits, together with annual

cost-of-living increases.  On June 20, 2007, however, they received letters from the

current plan administrators, Brotherhood president Freddie Simpson and secretary-

treasurer Perry Geller, stating that errors had been made in the calculation of their pension

benefits, and that the Plan was required under federal law to recoup any past

overpayments of benefits as a result of these errors.  (*See* Admin. Record at 618-20, 625-

27, 724-26, 738-40.)  Specifically, these letters asserted that Plaintiffs' final vacation pay

had been erroneously included as part of their compensation, despite the purported fact

that "the Plan has always excluded Vacation Pay from the defined term 'Compensation'

as a type of extraordinary remuneration."  (*Id.* at 618.)[8]  In addition, the letter to Plaintiff

---

[7]This same construction of § 7.3 of the Plan evidently was applied to compute the early
retirement benefits of former Plaintiff Susan Creswell.

[8]The letters noted that three percent employee contributions had been withheld from
Plaintiffs' final paychecks, including the portions of these paychecks attributable to their final
vacation pay.  The letters acknowledged that this withholding was inconsistent with the
exclusion of vacation pay from an employee's "compensation" under the Plan, and stated that

Meisel stated that her "early retirement should have been adjusted to take into account [her] retirement before [her] otherwise 'Normal Retirement Date.'" (*Id.* at 625.) Accordingly, Plaintiffs were advised that their monthly pension payments were being reduced to reflect the purportedly correct calculation of their benefits under the Plan, and that additional amounts were being withheld from their monthly payments to recoup the alleged overpayments they had received in the past.[9]

Plaintiffs promptly pursued administrative appeals of the Plan's decision to retroactively recalculate and reduce their pension benefits, but to no avail. This suit followed, with Plaintiffs seeking to overturn the Defendant Brotherhood's adverse benefit determinations, and also claiming that the Brotherhood breached various fiduciary duties owed under ERISA to the Plaintiff plan participants.

## III. <u>ANALYSIS</u>

### A. The Standards Governing the Parties' Cross-Motions

Through the present motions, each party seeks summary judgment in its favor on each of Plaintiffs' two pending claims.[10] Under the pertinent Federal Rule, summary

---

this three percent withholding was being refunded to Plaintiffs with interest. (*Id.*)

[9]Between the reduced monthly benefits and the amounts withheld to recoup alleged overpayments, Plaintiffs' monthly benefit payments decreased by between $155.64 (for Plaintiff Fleming) and $283.71 (for Plaintiff Pesta).

[10]Plaintiffs' claims for benefits under Count I of their complaint presumably are not amenable to resolution under summary judgment principles, but instead must be addressed under the guidelines set forth by the Sixth Circuit in *Wilkins v. Baptist Healthcare System, Inc.,* 150 F.3d 609, 619 (6th Cir. 1998). As explained below, however, the Court has determined that Plaintiffs' claims for benefits have been rendered moot, in light of the Court's resolution of

judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  As the Supreme Court has explained, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).  In addition, where a moving party — here, Plaintiffs — seeks an award of summary judgment in its favor on an issue as to which it bears the burden of proof, this party's "showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party."  *Calderone v. United States,* 799 F.2d 254, 259 (6th Cir. 1986) (internal quotation marks, citation, and emphasis omitted).

In deciding a motion brought under Rule 56, the Court must view the evidence in a light most favorable to the nonmoving party.  *Pack v. Damon Corp.,* 434 F.3d 810, 813 (6th Cir. 2006).  Yet, the nonmoving party "may not rely merely on allegations or denials in its own pleading," but "must — by affidavits or as otherwise provided in [Rule 56] — set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).  Moreover, any supporting or opposing affidavits "must be made on personal knowledge,

---

Plaintiffs' claims arising under ERISA's "anti-cutback" provision, 29 U.S.C. § 1054(g).  Accordingly, the *Wilkins* guidelines need not be applied here.

set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Fed. R. Civ. P. 56(e)(1). Finally, "the mere existence of a scintilla of evidence that supports the nonmoving party's claims is insufficient to defeat summary judgment." *Pack,* 434 F.3d at 814 (alteration, internal quotation marks, and citation omitted).

**B.** **The Defendant Brotherhood Breached a Fiduciary Duty Owed to the Plaintiff Plan Participants by Effectively Amending the Plan to Decrease Plaintiffs' Accrued Pension Benefits .**

In Count II of their complaint, Plaintiffs allege that the Defendant Brotherhood, as administrator of the Plan, breached fiduciary duties owed to Plaintiffs as Plan participants by, *inter alia,* reducing their pension benefits in violation of ERISA's so-called "anti-cutback" provision, 29 U.S.C. § 1054(g).[11] Under this provision, "[t]he accrued benefit of a participant under a plan may not be decreased by an amendment of the plan," with certain exceptions that do not apply here. 29 U.S.C. § 1054(g)(1).[12] In seeking summary judgment in their favor on this aspect of their breach of fiduciary duty claim, Plaintiffs contend that each of the requisite elements of an anti-cutback violation has been established as a matter of law: (i) their pension benefits qualify as "accrued benefits," (ii)

---

[11]To be accurate, Plaintiffs' complaint cites a parallel anti-cutback provision in the Internal Revenue Code, 26 U.S.C. § 411(d)(6), which "mirrors" the ERISA provision. *See Hunter v. Caliber System, Inc.,* 220 F.3d 702, 712 (6th Cir. 2000).

[12]This prohibition also extends to the reduction of early retirement benefits, insofar as the benefits in question are "attributable to service before the amendment" that resulted in the reduction. 29 U.S.C. § 1054(g)(2); *see also Cattin v. General Motors Corp.,* 955 F.2d 416, 422 (6th Cir. 1992) (discussing the 1984 amendment to § 1054(g) to encompass early retirement benefits that meet certain statutory conditions).

13

these benefits have been decreased, and (iii) the Defendant Brotherhood's reinterpretation of Plan terms — most prominently, the Plan's definition of "compensation" — constitutes an "amendment" of the Plan within the meaning of ERISA's anti-cutback provision. The Court agrees.

If the Court were to confine its analysis of Plaintiffs' anti-cutback claim solely to the arguments and authorities presented in Defendants' submissions, Plaintiffs would surely and readily prevail. The sum total of Defendants' challenge to Plaintiffs' anti-cutback claim is a citation to, and very brief discussion of, a handful of cases and an Internal Revenue procedure that (at best) stand for the proposition that a plan administrator may, under the appropriate circumstances, seek to recoup overpaid plan benefits. (*See* Defendants' Motion, Br. in Support at 22-24.) Yet, two of the cited cases involved the recoupment of overpaid ***disability*** benefits, as opposed to pension benefits, *see Vick v. Metropolitan Life Insurance Co.,* 417 F. Supp.2d 868, 881-82 (E.D. Mich. 2006); *Peitrowski v. ACIA,* 65 F. Supp.2d 614, 620 (E.D. Mich. 1999), and such welfare benefits do not qualify as accrued benefits within the ambit of ERISA's anti-cutback provision, *see* 29 U.S.C. 1051(1) (providing that employee welfare benefit plans are not subject to the portion of the ERISA statutory scheme that contains the anti-cutback provision); *see also Battoni v. IBEW Local Union No. 102 Employee Pension Plan,* 594 F.3d 230, 234 (3d Cir. 2010) (confirming that "welfare benefits are exempt from coverage under the Anti-Cutback rule"). Another case cited by Defendants, *Wells v. United States Steel & Carnegie Pension Fund, Inc.,* 950 F.2d 1244, 1250-51 (6th Cir. 1991), did

14

involve the attempted recoupment of overpaid pension benefits, but this attempt was opposed on the equitable grounds of laches and estoppel, without any discussion or mention whatsoever of ERISA's anti-cutback provision.

Likewise, Defendants' appeal to an Internal Revenue procedure, Rev. Proc. 2006-27, (*see* Defendants' Motion, Ex. E) — as well as an unpublished decision that briefly discusses a predecessor Internal Revenue procedure, Rev. Proc. 2003-44, without ruling on its applicability to the case before the court, *see Ramsey v. Formica Corp.,* No. 1:04-CV-149, 2006 WL 38995, at *4 (S.D. Ohio Jan. 5, 2006) — fails to shed any light whatsoever on the viability of Plaintiffs' anti-cutback claim in this case. This procedure, generally speaking, establishes a scheme under which plan sponsors may make corrections to certain types of retirement plans that would otherwise run afoul of the Internal Revenue Code provisions governing such plans. Yet, there is no evidence that the Defendant Brotherhood has ever invoked this mechanism to correct any alleged Plan defects of the sort addressed in the Internal Revenue procedure. Nor, indeed, have Defendants even *identified* any such Plan defect that would trigger the applicability of this Internal Revenue procedure. In any event, the procedure itself expressly states that such a defect may be corrected through a plan amendment only if "the amendment complies with the requirements of" a variety of Internal Revenue Code provisions, including the Code's counterpart to ERISA's anti-cutback provision, 26 U.S.C. § 411(d)(6). (*See* Defendants' Motion, Ex. E, Rev. Proc. 2006-27 at § 4.05.) Far from supplanting the anti-cutback provision, then, this Internal Revenue procedure explicitly

incorporates it as a limit on a plan sponsor's ability to correct a plan defect through an amendment.

In short, the authorities cited by Defendants utterly beg the question presented here — namely, whether the Defendant Brotherhood ran afoul of ERISA's anti-cutback provision by recalculating and reducing Plaintiffs' pension benefits based on a reinterpretation of certain Plan provisions.[13]  Plaintiffs, in contrast, point to a case that is directly on point, both factually and legally.  In *DiCioccio v. Duquesne Light Co.,* 911 F. Supp. 880, 884-85 (W.D. Pa. 1995), the plaintiff class of retirees of the defendant company challenged the reinterpretation of the term "compensation" in the company's retirement plans to exclude income from the plaintiffs' exercise of stock options.  Until June of 1990, such income was included in the calculation of the plaintiffs' benefits under the retirement plans, but the plan administrator then issued a memorandum opining that this income did not qualify as "compensation" under the plans, and directing the company's benefits manager to exclude it from any future benefit calculations.  *See DiCioccio,* 911 F. Supp. at 887, 890-91.  As one of their claims in the case, the plaintiffs alleged that the plan administrator's decision to exclude their stock option income from

_____

[13]Perhaps Defendants and their counsel are to be congratulated for filing a brief in support of their summary judgment motion that at least purports to cite *some* authority on this question, no matter how inapposite it might be.  This stands in contrast to their response to Plaintiffs' summary judgment motion, which cites *no authority whatsoever* on any issue even remotely touching upon Plaintiffs' anti-cutback claim.  Indeed, the only authorities cited *at all* in Defendants' response brief are a few cases addressing the general rules for ERISA plan interpretation.  (*See* Defendants' Response Br. at 3.)  As Plaintiffs aptly observe in their reply brief, Defendants' "'mediation-style' response brief . . . largely ignores most of Plaintiffs' arguments" in support of their request for summary judgment.  (Plaintiffs' Reply Br. at 1.)

the calculation of their pension benefits was "a *de facto* amendment" to the defendant company's retirement plans that reduced their accrued benefits in violation of ERISA's anti-cutback provision.  *DiCioccio,* 911 F. Supp. at 894.  The defendants, however, contended that the plan administrator's memorandum "constituted an exercise of appropriate discretionary authority under the Plans and simply was intended to correct a mistake in practice which had inadvertently developed."  911 F. Supp. at 895.

The district court granted summary judgment to the plaintiffs on their anti-cutback claim, finding that the plan administrator's reinterpretation of the plans to exclude stock option income from the calculation of an employee's pension benefits could not be applied retroactively to recalculate and reduce the benefits that had accrued prior to this new interpretation of the plans.  911 F. Supp. at 897.  The court explained:

> ERISA defines an accrued benefit in the case of a defined benefit plan as "the individual's accrued benefit determined under the plan and, except as provided in section 1054(c)(3) of this title, expressed in the form of an annual benefit commencing at normal retirement age . . . ."  29 U.S.C. § 1002(23)(A).  ERISA further provides that "the accrued benefit of a participant under a plan may not be decreased by an amendment of the plan, other than an amendment described in section 1082[(d)(2)] or 1441 of this [t]itle."  29 U.S.C. § 1054(g)(1).  It follows *a fortior[ ]i* that an accrued benefit may not be retroactively decreased through the purported exercise of an administrator's discretion.

> In the instant matter, the administrator did not attempt to exercise any purported discretion to exclude the . . . income generated from the stock option and appreciation rights prior to June 5, 1990.  Because the language contained in the Plans defining compensation was inclusive rather than exclusive and specifically encompassed the type of income recognized upon the [stock option] exercises, it follows that those employees which exercised their stock option and appreciation rights in 1989 and had income reported on their W-2's for the calendar year of 1989 acquired an accrued

17

benefit. Accordingly, plaintiffs are entitled to partial summary judgment on this aspect of the claim set forth in Count II.

911 F. Supp. at 897 (footnote omitted).

The reasoning of *DiCioccio,* if applied here, plainly would warrant an award of summary judgment in Plaintiffs' favor on their anti-cutback claim. Indeed, Plaintiffs' claim in the present suit is stronger in one respect than the similar claim asserted in *DiCioccio,* because it appears that not all members of the plaintiff class in that case had retired and begun drawing pension benefits at the time the plan administrator reinterpreted the term "compensation" in the plans and applied this reinterpretation to recalculate the plaintiffs' benefits. Arguably, then, any calculation of benefits prior to an employee's retirement was only tentative and did not give rise to an "accrued benefit," as necessary to trigger ERISA's anti-cutback provision.[14] Here, in contrast, each of the four Plaintiffs had already retired, and was being paid pension benefits in accordance with the Plan as it was construed at the time of his or her retirement, when the Defendant Brotherhood announced a new interpretation of the Plan in June of 2007 and applied it retroactively to reduce the benefits Plaintiffs had been receiving to that point. Surely, then, it would behoove Defendants to identify some ground for distinguishing the ruling in *DiCioccio,* or at least to suggest why the Court should not follow this decision. Yet, remarkably, Defendants do not so much as even acknowledge this adverse ruling.

The Court is reluctant to fashion and address arguments in support of Defendants'

---

[14]The Court does not (and need not) express any view as to the merits of this argument.

position that they and their counsel have failed to advance on their own behalf. Nonetheless, certain aspects of the analysis in *DiCioccio* are rather abbreviated and warrant more extensive consideration. First, ERISA's anti-cutback provision is triggered only by an "amendment of the plan" that reduces an accrued benefit. 29 U.S.C. § 1054(g)(1). In finding this condition satisfied, the *DiCioccio* court seemingly relied on the common-sense notion that a plan administrator should not be able to accomplish through a discretionary "reinterpretation" of the plan what ERISA's anti-cutback provision prohibits through a traditional plan amendment. *See DiCioccio,* 911 F. Supp. at 897. Yet, the Court must adhere to the statute's express language, rather than a common-sense gloss upon this language, and so it must confirm that the Defendant Brotherhood's reinterpretation of the Plan truly constituted an "amendment" within the meaning of § 1054(g).

As it happens, the Sixth Circuit has addressed this question, holding that a plan administrator's statement of the proper interpretation of a plan qualifies as an "amendment" under ERISA's anti-cutback provision. *See Hunter,* 220 F.3d at 712. In that case, the defendant plan sponsor adopted written amendments in order to clarify the intended operation of a retirement plan. The plaintiffs argued that these amendments could not be considered both amendments (for purposes of an ERISA anti-cutback claim) *and* interpretations of the plan (for purposes of triggering the deferential "arbitrary and capricious" standard of review) "because an amendment, by definition, *changes* rather than interprets." *Hunter,* 220 F.3d at 712. The court disagreed, stating that it saw "no

19

reason why an amendment that interprets a plan may not . . . be considered an 'amendment' for purposes of" ERISA's anti-cutback provision. 220 F.3d at 712. In so ruling, the court cited with approval a Third Circuit decision, *Hein v. F.D.I.C.*, 88 F.3d 210, 216 (3d Cir. 1996), holding that a plan had been amended within the meaning of § 1054(g) even though "the actual text of the Plan was [not] amended or modified in any way." The Third Circuit explained that "[a]n erroneous interpretation of a plan provision that results in the improper denial of benefits to a plan participant may be construed as an 'amendment' for the purposes of" ERISA's anti-cutback provision. *Hein,* 88 F.3d at 216. Consistent with these authorities, this Court concludes that the Defendant Brotherhood's reinterpretation of the Plan in its June 20, 2007 letters to Plaintiffs constituted an "amendment" to the Plan within the meaning of § 1054(g).

Next, *DiCioccio* only briefly addresses the language in ERISA's anti-cutback provision limiting its reach to "accrued benefit[s]." 29 U.S.C. § 1054(g)(1). At first glance, this requirement appears to be easily satisfied in this case. For a defined benefit plan like the one at issue here, ERISA defines an "accrued benefit" as "the individual's accrued benefit determined under the plan and . . . expressed in the form of an annual benefit commencing at normal retirement age." 29 U.S.C. § 1002(23)(A). The Sixth Circuit has noted the "surface ambiguity created by" this definition's "circular reference" to an individual's "accrued benefit," but has nonetheless construed this provision as "mak[ing] plain that the terms of [the] pension plan document(s) in effect while a participant worked for a covered employer dictate his or her 'accrued benefits.'"

*Thornton v. Graphic Communications Conference of International Brotherhood of Teamsters Supplemental Retirement & Disability Fund,* 566 F.3d 597, 605-06 (6th Cir. 2009). Because Plaintiffs' initial pension benefit payments upon their retirement were determined under the terms of the Plan as it was then construed by the Defendant Brotherhood and its individual plan administrators — most notably, with the understanding that final vacation pay was to be counted as part of an employee's "compensation" under the Plan — and because there were no more conditions or prerequisites that were yet to be satisfied before these benefits could be paid to the Plaintiff retirees, there seemingly can be no question that Plaintiffs' benefits had "accrued" upon their retirement within the meaning of § 1054(g)(1). Likewise, the language of the Plan itself bolsters this conclusion, as the Plan defines an "Accrued Benefit" as "the Normal Retirement Pension payable at Normal Retirement Date determined pursuant to" a formula set forth elsewhere in the Plan, (Plan at § 5.1), and there is no dispute that, upon their retirement, Plaintiffs began to draw pension benefits calculated in accordance with this formula as it was then understood to operate.

Yet, as Plaintiffs implicitly recognize in the brief in support of their motion, something more is required to fully satisfy ERISA's definition of an "accrued benefit." It surely is not enough, after all, to merely claim that a pension benefit was "determined under the plan," 29 U.S.C. § 1002(23)(A), without any effort to show that this benefit determination rested upon some tenable reading of the controlling plan documents. As Defendants argue — albeit, true to form, without citation to authority — a wholly

mistaken benefit determination presumably would not produce an "accrued benefit determined under the plan," § 1002(23)(A), and thus might not be entitled to protection under ERISA's anti-cutback provision. And, in fact, the courts have recognized precisely this principle, rejecting anti-cutback claims where the plaintiff plan participants could not establish an entitlement under the pertinent pre-retirement plan provisions to a level or type of pension benefits that subsequently was reduced or eliminated. *See, e.g.,Thornton,*, 597 F.3d at 609, 616 (holding that a post-retirement increase in benefits was not an "accrued benefit" under ERISA, and therefore could be eliminated without running afoul of ERISA's anti-cutback provision); *Hunter,* 220 F.3d at 712-17 (holding that the plaintiffs were not entitled to a lump-sum distribution of their benefit plan account balances under the pre-amendment versions of the plans, and thus could not claim that the plan amendments violated ERISA's anti-cutback provision); *Cattin v. General Motors Corp.,* 955 F.2d 416, 423-24 (6th Cir. 1992) (finding that an anti-cutback claim failed because the plaintiffs "did not meet the prerequisites of the plan before the amendment"); *Hein,* 88 F.3d at 217 (observing that § 1054(g) "can protect an entitlement to benefits, but it cannot create an entitlement to benefits when no entitlement exists under the terms of the Plan").

Consequently, to secure an award of summary judgment in their favor on their anti-cutback claim, Plaintiffs must establish that the benefit amounts they were receiving prior to the Defendant Brotherhood's June 2007 recalculation and reduction of those benefits were based on a permissible reading of the terms of the Plan. Under the Sixth

Circuit's decision in *Hunter,* 220 F.3d at 709-12, the Brotherhood's interpretation of the Plan at the time of Plaintiffs' retirement (from 2001 until 2006) is subject to "arbitrary and capricious" review, provided that the Plan confers upon the Brotherhood the discretion to construe its terms. The Plan clearly does so, (*see* Defendants' Motion, Ex. A, Plan at § 16.5 ("The Plan Administrator shall have power to construe this Agreement, to make all benefit determinations and to make factual findings, [and] any such construction by the Plan Administrator made in good faith [shall] be final and conclusive.")), and both sides agree that the "arbitrary and capricious" standard applies here, (*see* Defendants' Motion, Br. in Support at 13, 16; Plaintiffs' Motion, Br. in Support at 11-12).

In order to determine, then, whether Plaintiffs' initial retirement benefits, before their recalculation and reduction, were "accrued benefits" that were permissibly "determined under the plan," 29 U.S.C. § 1002(23)(A), the Court must consider whether the interpretation of the Plan that generated these initial benefit awards passes muster under the "arbitrary and capricious" standard of review. This is the "least demanding form of judicial review," under which this Court must uphold a denial of benefits if it is "rational in light of the plan's provisions." *Monks v. Keystone Powdered Metal Co.,* 78 F. Supp.2d 647, 657 (E.D. Mich. 2000) (internal quotation marks and citations omitted), *aff'd,* 2001 WL 493367 (6th Cir. May 3, 2001). "When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Davis v. Kentucky Finance Cos. Retirement Plan*, 887 F.2d 689, 693 (6th

Cir. 1989) (internal quotations and citations omitted), *cert. denied,* 495 U.S. 905 (1990).

The parties differ as to two aspects of the initial calculation of Plaintiffs' pension benefits at the time of their retirement. First and foremost, they disagree as to the interpretation given to the Plan term "Compensation" in calculating these benefits. As noted earlier, the Plan defines "Compensation" as "the Employee's basic earnings, paid by the Employer for a Plan Year which is exclusive of overtime, bonuses, and other extraordinary compensation." (Defendants' Motion, Ex. A, Plan at § 1.9) At the time of Plaintiffs' retirement, the Defendant Brotherhood and the individuals charged with plan administration construed this term as encompassing an employee's "final vacation pay" — that is, the lump-sum payment included in an employee's final paycheck that reflects the employee's earned but unused vacation. In recalculating and reducing Plaintiffs' benefits in June of 2007, however, the Brotherhood determined that final vacation pay was "extraordinary" remuneration that should be excluded from the Plan's definition of "compensation."

The Court finds that the Brotherhood's initial interpretation of "compensation" as including an employee's final vacation pay was not arbitrary and capricious. As noted by Plaintiffs, each of them "earned" his or her vacation in the ordinary course of his or her employment, and each received his or her ordinary salary for any vacation days taken. Pay for unused vacation, then, would arguably satisfy the Plan's definition of "compensation" as "basic earnings," as opposed to "extraordinary compensation." Certainly, it is reasonable to view an employee's earned vacation, and the pay received in

lieu of unused vacation, as more akin to routine "earnings" than to bonuses and other out-of-the-ordinary remuneration that the Plan references as "extraordinary" compensation.

In addition, Plaintiffs point out that this interpretation is readily harmonized with the Brotherhood's construction of other Plan terms at the time, as evidenced by its contemporaneous practices. As noted earlier, the Plan is funded in part by three-percent "Participant[] Contributions" that are withheld from each participant's "monthly *compensation*." (Plan at § 12.2(a) (emphasis added).) It is undisputed that this three-percent contribution was withheld from the entirety of each Plaintiff's final paycheck, including the portion attributable to final vacation pay. If Plaintiffs' final vacation pay was treated as "monthly compensation" for purposes of this withholding provision, it stands to reason that it was properly treated as "compensation" for purposes of calculating Plaintiffs' pension benefits. Moreover, Plaintiffs have provided the final paycheck stubs of Plaintiff Pesta showing that his final vacation payments were designated as "regular" earnings. (*See* Plaintiffs' Motion, Ex. 16.)

Against these points, Defendants rely principally on a one-paragraph passage in the brief in support of their summary judgment motion, in which they maintain that Plaintiffs seek to exploit a "loophole" that "was never the stated intention of the Plan." (Defendants' Motion, Br. in Support at 18-19.) The Court is puzzled, however, as to how it might go about discerning the "stated intention of the Plan," other than by resort to the language of the Plan itself. As Defendants acknowledge, the Plan is silent as to whether vacation pay should or should not be included as "compensation." (*See id.* at 20.) It

follows that the question must be resolved by resort to surrounding language, as well as other sources that might illustrate the reasonableness (or lack thereof) of treating vacation pay as compensation. Defendants have nothing to offer on this score, beyond their sweeping and utterly unfounded claim that Plaintiffs' proposed interpretation would read a Plan provision — § 6.2, the provision specifying the formula for pension benefit calculation — "out of the plan document." (Defendants' Response Br. at 3.) In fact, this provision remains firmly in place and fully operative under either side's preferred construction of "compensation" — the only difference is what is ***included*** in the "compensation" that is plugged into the § 6.2 formula. Thus, even accepting Defendants' characterization of Plaintiffs' proposed construction as a "loophole," it was not arbitrary and capricious to calculate Plaintiffs' pension benefits by resort to a "loophole" that rested upon a rational and reasoned interpretation of the language of the Plan itself.

Next, the parties have advanced two different interpretations of § 7.3 of the Plan, which determines the amount by which early retirement benefits are to be reduced in the event that an early retiree elects to receive his or her benefits immediately rather than at the normal retirement date. Specifically, this provision calls for such early retirement benefits to be "reduced by three per cent (3%) for each complete Plan Year between the Participant's Normal Retirement Date and his Requested Early Retirement Date." (Defendants' Motion, Ex. B, 7/1/2002 Early Retirement Amendments.) The Plan, in turn, defines a "Plan Year" as an ordinary calendar year from January 1 to December 31. (*See* Defendants' Motion, Ex. A, Plan at § 1.29.) In computing Plaintiff Gail Meisel's pension

benefits, it was determined that no reduction was warranted, because no "complete Plan Year" elapsed between her early retirement date in October of 2006 and her normal retirement date ten months later, in mid-2007.

This interpretation of the Plan was not arbitrary and capricious, and Defendants do not seriously contend otherwise. Plainly, no complete calendar year elapsed between Plaintiff Meisel's early retirement and normal retirement dates. Nonetheless, Defendants assert that the early retirement amendment in question was not "intended to apply to any individual who served as a 'core' employee," such as Plaintiff Meisel. (Defendants' Motion, Br. in Support at 21.) Yet, Defendants fail to point to any Plan language that might evidence such an intent, and the language of § 7.3 itself includes no such limitation to "non-core" employees (or any other subset of employees).[15] Neither does this provision provide any support for Defendants' contention that the annual three-percent reduction should be pro-rated for partial plan years, where the provision itself addresses only "complete" plan years. Thus, the reading of § 7.3 used to determine Plaintiff Meisel's early retirement benefits readily passes muster under the "arbitrary and capricious" standard of review.[16]

---

[15]In any event, as Plaintiffs point out, Defendants' argument would seem to call into question Plaintiff Meisel's eligibility to take early retirement *at all,* and not merely the amount by which her retirement benefits should have been reduced. Yet, the individuals currently responsible for plan administration approved this early retirement, and no effort has been made to withdraw this approval.

[16]In their complaint and summary judgment motion, Plaintiffs also take issue with Defendants' determination in June of 2007 that they were improperly credited with one extra "month of service" in the initial calculation of their pension benefits. Yet, in their cross-motion

In sum, Plaintiffs have established each element of their anti-cutback claim as a matter of law.  Their pension benefits as calculated upon their retirement qualify as "accrued benefits" under ERISA's anti-cutback provision, because these benefits were determined under an interpretation of the Plan that was not arbitrary or capricious.  These accrued benefits were later decreased as a result of a reinterpretation of the Plan by the Defendant Brotherhood and the individuals who currently serve as plan administrators.  Finally, this reinterpretation of the Plan constituted an "amendment" of the Plan under § 1054(g) and the case law construing this provision.  It follows that the reduction in Plaintiffs' pension benefits violated ERISA's anti-cutback provision.

There remains only the question of the appropriate remedy for this violation of § 1054(g).  As noted earlier, Plaintiffs asserted their anti-cutback claim in Count II of their complaint, citing this violation as one of the ways in which the Defendant Brotherhood breached the fiduciary duties owed to the Plaintiff Plan participants.  This breach of fiduciary duty claim, in turn, has presumably been brought under the ERISA provision that authorizes suit "by a participant . . . (A) to enjoin any act or practice which violates any provision of this subchapter . . . , or (B) to obtain other appropriate equitable relief (i)

---

for summary judgment, Defendants state that only "two facets" of the Plan are at issue:  the inclusion of vacation pay in "compensation," and the application of the early retirement reduction provision.  (*See* Defendants' Motion, Br. in Support at 8.)  Likewise, Defendants have failed to address the "months in service" issue in their response to Plaintiffs' motion.  Accordingly, the Court finds that Defendants have forfeited their opportunity to challenge Plaintiffs' contention, supported by evidence, (*see* Plaintiffs' Motion, Br. in Support at 24), that the "months of service" determinations made at the time of their initial benefit calculations were not arbitrary or capricious.

to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3); *see also Varity Corp. v. Howe,* 516 U.S. 489, 515, 116 S. Ct. 1065, 1079 (1996) (recognizing that this provision authorizes breach of fiduciary duty claims brought by plan participants and seeking individual relief). It follows that Plaintiffs would be limited under this breach of fiduciary duty claim to injunctive and equitable relief.

Much of the relief sought in Plaintiffs' complaint fits comfortably within this remedial scheme. In particular, they seek (i) a declaration reversing the June 2007 decision to recalculate and reduce their pension benefits and restoring these benefits to the amounts determined at the time of their retirement, together with any cost of living increases to which they are entitled, and (ii) an order enjoining Defendants from applying the Brotherhood's June 2007 reinterpretation of "compensation" and the early retirement provision at § 7.3 of the Plan to recompute or reduce their benefits. Yet, one item of damages is potentially problematic: Plaintiffs seek an order compelling Defendants to return to them the full amount of any benefit reductions made in violation of ERISA's anti-cutback provision, as well as all amounts withheld in an effort to recoup alleged overpayments made prior to June of 2007. The Supreme Court has recognized that such claims for restitution may be equitable or legal in nature, depending on the basis for the claim and the nature of the relief sought. *See Great-West Life & Annuity Insurance Co. v. Knudson,* 534 U.S. 204, 212-13, 122 S. Ct. 708, 714 (2002).

In this case, the Court finds that Plaintiffs' plea for restitution falls on the equitable

side of this divide, and thus is an available remedy under Count II of their complaint. As the Supreme Court has explained, "for restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession." *Great-West Life,* 534 U.S. at 214, 122 S. Ct. at 714-15 (footnote omitted). The funds that Plaintiffs seek to recover were withheld from their monthly benefit payments and presumably remain in the Defendant Plan, where they may be identified and restored to Plaintiffs. Thus, it would appear that the restitution sought by Plaintiffs may be awarded in a breach of fiduciary duty claim brought under § 1132(a)(3).

This conclusion is not free from doubt, however. In *Thornton,* 566 F.3d at 616-17, the Sixth Circuit appeared to conclude that relief analogous to the restitution sought by Plaintiffs here was properly recoverable in a claim for benefits under 29 U.S.C. § 1132(a)(1)(B), as opposed to a claim under § 1132(a)(3). The Second Circuit has reached a similar conclusion, holding that an anti-cutback claim was properly analyzed as brought under § 1132(a)(1)(B), rather than § 1132(a)(3). *See Frommert v. Conkright,* 433 F.3d 254, 269-70 (2d Cir. 2006). Finally, in *Hunter,* 220 F.3d at 711-12, the Sixth Circuit seemingly did not decide whether an anti-cutback claim should be analyzed as a claim for benefits under § 1132(a)(1)(B) or a breach of fiduciary duty claim. Accordingly, the Court finds in the alternative that Plaintiffs may proceed with their anti-cutback claim under § 1132(a)(1)(B), *see Hunter,* 220 F.3d at 711; *Frommert,* 433 F.3d at 269-70, and it is clear that the restitution they seek may be awarded as a "recover[y] [of] benefits" under

this ERISA provision, *see Frommert,* 433 F.3d at 270.[17]

Finally, in light of the Court's conclusion that Plaintiffs are entitled to summary judgment in their favor on their anti-cutback claim, the Court need not address the other theories of recovery advanced in Plaintiffs' complaint. In particular, the Court need not (and does not) decide whether the Defendant Brotherhood's June 2007 reinterpretation of the Plan's definition of "compensation" and its early retirement provision would survive scrutiny under "arbitrary and capricious" review. This issue, if reached and decided by the Court, would not affect the rights of the Plaintiffs actually before the Court — who, by virtue of the Court's rulings, have secured all of the relief sought in their complaint — but would matter only to those employees who retired ***after*** the Brotherhood's reinterpretation of the Plan. This latter class of employees cannot claim that their retirement benefits were recalculated and reduced as the result of a retroactively applied Plan amendment, and it follows that they, unlike Plaintiffs, presumably cannot claim the protection of ERISA's anti-cutback provision. Consequently, the Court declines to issue what would be, in effect, an advisory opinion as to the rights of Plan participants who are not parties to this case.[18]

---

[17]This raises the question whether Plaintiffs' anti-cutback claim should have been analyzed under the standards of *Wilkins,* 150 F.3d at 619, rather than summary judgment standards. Yet, in both *Thornton,* 566 F.3d at 601, and *Hunter,* 220 F.3d at 709, the Sixth Circuit reviewed anti-cutback claims that had been resolved by the lower courts on summary judgment motions, without suggesting that the district courts should have analyzed these claims under the procedures announced in *Wilkins.*

[18]One final matter remains to be resolved in this case — namely, the precise substance of the judgment to be entered in Plaintiffs' favor as a result of the Court's award of summary

## IV. <u>CONCLUSION</u>

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Plaintiffs' July 8, 2009 motion for summary judgment (docket #47) is GRANTED IN PART, with respect to Plaintiffs' claim under ERISA's anti-cutback provision, 29 U.S.C. § 1054(g), and is otherwise DENIED WITHOUT PREJUDICE. IT IS FURTHER ORDERED that Defendants' May 26, 2009 motion for summary judgment (docket #39) is DENIED.

Next, IT IS FURTHER ORDERED that, within *fourteen (14) days* of the date of this opinion and order, Plaintiffs shall file and serve a proposed judgment reflecting the relief to be awarded in light of the Court's award of summary judgment in Plaintiffs' favor on their anti-cutback claim. In the event that Plaintiffs are unable to secure Defendants' concurrence as to the form and substance of this proposed judgment, Defendants shall file and serve any objections to Plaintiffs' proposed judgment within *seven (7) days* after service of Plaintiffs' proposed judgment. The Court will then resolve any objections and enter an appropriate judgment.

Finally, IT IS FURTHER ORDERED that, within *seven (7) days* of the date of this

---

judgment on their anti-cutback claim. The record presently before this Court does not establish the precise amount of restitution owed to each Plaintiff, and the Court also is unsure whether factual issues remain as to these amounts. Accordingly, Plaintiffs will be directed to submit a proposed judgment to the Court, and Defendants will be given an opportunity to raise objections to this proposed judgment in the event that Plaintiffs are unable to secure their concurrence as to the form and substance of the judgment to be entered. In addition, the Court directs Plaintiffs to file a proposed stipulated order of dismissal reflecting the resolution of the claims brought by Plaintiff Susan Creswell.

opinion and order, Plaintiffs shall submit to the Court a proposed stipulated order of

dismissal reflecting the resolution of the claims of Plaintiff Susan Creswell (now being

pursued on behalf of her estate by personal representative Amy Redd).


s/Gerald E. Rosen
Chief Judge, United States District Court

Dated:  March 31, 2010

I hereby certify that a copy of the foregoing document was served upon counsel of record
on March 31, 2010, by electronic and/or ordinary mail.

s/Ruth A. Gunther
Case Manager